UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

OMNEAH HAMDI,

*Defendant*.

**MEMORANDUM & ORDER**
24-cr-00409 (NCM)

**NATASHA C. MERLE**, United States District Judge:

Defendant Omneah Hamdi is charged with, *inter alia*, conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347, 1349. *See* Superseding Indictment, ECF No. 88. Before the Court is Hamdi's motion to suppress statements made to law enforcement during an interview at her home. Mot. 1.[1] In the alternative, Hamdi requests an evidentiary hearing to resolve any disputed factual issues. Mot. 4.

For the reasons stated below, Hamdi's motion is **DENIED**.

## BACKGROUND

On July 15, 2024, four law enforcement officers arrived at Hamdi's residence as part of a health care fraud investigation. Mot 1; Opp'n 1. The officers included one special agent from the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), two New York City Police Department ("NYPD") detectives, and

[1] The Court hereinafter refers to defendant's Motion to Suppress, ECF No. 305, as the "Motion"; the government's Response in Opposition, ECF No. 317, as the "Opposition"; and the Declaration of Omneah Hamdi, ECF No. 305-1, as the "Defendant's Declaration." Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

one NYPD officer. Opp'n 1. Hamdi greeted the officers with her roommate, Nino McMullins. Opp'n Ex. A ("HHS-OIG Report") 2, ECF No. 317-1. The officers identified themselves to Hamdi and informed Hamdi of the nature of the interview. Opp'n 1; *see* Def.'s Decl. ¶ 5. The officers asked McMullins to move to a separate room while they interviewed Hamdi; McMullins complied. Opp'n 1; Def.'s Decl. ¶ 14.

During the interview, Hamdi told the officers that she was an employee of Happy Family Social Adult Day Care Center ("HFSADC"), a social adult day care ("SADC") center in Brooklyn, New York. Opp'n 1. HFSADC billed Medicaid long-term managed care organizations for providing SADC services to Medicaid recipients. Opp'n 1. When Hamdi told the officers that she was "only paid for the days she visited the day care," the officers informed Hamdi that lying to a federal agent is a crime. Opp'n 1–2.[2]

Hamdi then informed the officers that HFSADC paid her to recruit Medicaid recipients to join HFSADC. Opp'n 2. At this point in the interview, Hamdi repeatedly changed her story. First, she told officers that she managed approximately 40 HFSADC members who attended the center three times per week and that she received a $300 bonus per member every two months, which she referred to as a "Welcoming Fee." Opp'n 2. She later corrected herself, stating that she managed over 200 members as a marketer for HFSADC. Opp'n 2. Hamdi said that those members were paid $300 per month if approved for two days per week of SADC services and $400 per month when approved for three days per week of SADC services. Opp'n 2. Hamdi told the officers that

[2] The HHS-OIG report refers to this as "the 1001 warning" in reference to 18 U.S.C. § 1001. HHS-OIG Rep. 2. 18 U.S.C. § 1001 criminalizes, among other things, making a materially false statement to federal law enforcement agency about a matter within that agency's jurisdiction. 18 U.S.C. § 1001(a).

she heard some members were paid not to attend HFSADC but that she was not involved in making payments to any members. Opp'n 2.

Finally, Hamdi changed her story again, informing the officers that she helped HFSADC disguise payments to members and that Zakia Khan, the owner of HFSADC, would provide Hamdi with checks to deposit into her own bank account. Opp'n 2. Hamdi told the officers that she would withdraw the amount of the checks from Khan in cash, spend a portion of the cash on items for HFSADC, and then give the rest to Khan, who would give Hamdi more cash to pay the members that Hamdi had recruited. Opp'n 2. Hamdi recalled that Khan had recently written her a check for approximately $15,000 to $18,000 designated for payments to SADC members. Opp'n 2. Hamdi said that Khan paid her by check at the end of each month and that she would wait for the check to clear before paying her members cash on the third day of the next month. Opp'n 2. When the interview concluded, Hamdi provided her cell phone number to law enforcement. Opp'n 2.

On March 18, 2025, Hamdi was charged in a superseding indictment with, *inter alia*, conspiracy to commit health care fraud. On June 22, 2026, Hamdi filed the instant motion, requesting that this Court (1) suppress all statements made during her July 2024 interview and (2) order an evidentiary hearing to resolve any disputed factual issues. Mot. 1, 4. Hamdi filed a declaration with her motion, stating that she "felt terrified" of the officers and that she was unaware that she had the right to not speak with them or forbid them from entering her home. Def.'s Decl. ¶¶ 9–11. She further explains that she "did not want to speak with [the officers], but felt like [she] had to," and that she "felt like [she] was trapped." Def.'s Decl. ¶¶ 12–13. She also notes that she is a practicing Muslim and consequently "it is prohibited for men who are not related to [her] to come into [her]

home." Def.'s Decl. ¶¶ 6–8. On July 22, 2026, the government filed its opposition. *See* Opp'n.

## DISCUSSION

Defendant moves to suppress the July 15, 2024, statements she made to law enforcement. Mot. 4.[3] The thrust of defendant's argument is that the circumstances under which her statements were made constituted a custodial interrogation. Mot. 3–4. And because she was not provided *Miranda* warnings, she says those statements must be suppressed. Mot. 3–4. Moreover, she contends that her statements must also be suppressed because the law enforcement officers engaged in coercive conduct such that her statements were made involuntarily. Mot. 3–4.

### I. Custodial Interrogation

In support of her argument that her un-*Mirandized* statements were made during a custodial interrogation, defendant cites several factors, including: (1) the number of armed law enforcement personnel present, (2) the location of the interview, (3) the "1001 warning" issued by the officers, (4) the officers' violation of her strongly held religious beliefs, and (5) the officers' failure to warn her that she was free to leave and not answer questions. Mot. 2–4. These factors, according to defendant, all indicate that a reasonable person in her position would not have understood that she was free to leave, and that

---

3 Defendant also requests an evidentiary hearing to resolve any disputed factual issues. Mot. 4. Here, however, there are none. Accordingly, the request is denied. *See United States v. Barnes*, No. 23-06385-cr, 2024 WL 4368274, at *1 (2d Cir. Oct. 2, 2024) ("An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers . . . enable the court to conclude that contested issues of fact going to the validity of the search are in question." (quoting *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992))).

there was a restraint on her freedom of movement akin to that associated with a formal arrest. Mot. 2–4.

The government counters that the defendant's statements should not be suppressed because she was not in custody for *Miranda* purposes at the time she made them. Opp'n 7. The government first explains that that defendant was neither handcuffed, nor physically restrained in any way. Opp'n 4–5. Moreover, the government cites the location of the interview—defendant's own home—as strongly weighing against the conclusion she was in custody. Opp'n 5. The government also contends that the number of law enforcement officers present during the interview is insufficient to give rise to an inference of custody, citing cases in which courts have found defendants not in custody despite the presence of many more officers. Opp'n 5. And the government emphasizes that the four officers who were present never threatened or otherwise told defendant that she was not free to leave or end the interview. Opp'n 5–6. The government notes on this point that defendant did not ask to end the interview. Opp'n 4. These factors lead the government to conclude that a reasonable person in defendant's position would have felt free to leave the interview. Opp'n 4–7. Accordingly, in the government's view defendant was not in custody for *Miranda* purposes when she spoke to the officers.[4]

A. <u>Legal Standard</u>

"In *Miranda v. Arizona*, the Supreme Court acknowledged that the in-custody interrogation of persons suspected or accused of crime contains inherently compelling

---

4 The government also argues that the duration of the interview "weighs in favor of finding that [defendant] was not in custody." Opp'n 7. While the Court agrees that duration is generally a factor in the custody analysis, neither the defendant nor the government has provided any indication of how long the interview lasted.

pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).[5] "It is well settled that *Miranda* requires all individuals who are under arrest, or otherwise in police custody, to be informed prior to interrogation, *inter alia,* of their right to remain silent and to have an attorney present during questioning." *Id.* at 155.

*Miranda*'s warning requirements, however, apply only to "custodial interrogation." *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (quoting *Miranda*, 384 U.S. at 444). To determine whether an individual is in custody for purposes of *Miranda*, courts apply a two-prong objective test, asking "(1) whether a reasonable person would have thought he was free to leave . . . and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016). Neither the subjective beliefs of a suspect nor the perceptions of an officer bear on the custody analysis. *Id.* And while "an officer's knowledge or beliefs may bear upon the custody issue if they are conveyed . . . to the individual being questioned," that is true "only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)).

Although both elements are required, the second is the "ultimate inquiry" because the "free–to–leave inquiry reveals only whether the person questioned was seized." *Newton*, 369 F.3d at 672. A suspect can "reasonably deem her situation comparable to a

5 Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

formal arrest" where "her detention is not likely to be temporary and brief and [she] feels that she is completely at the mercy of police[.]" *Faux*, 828 F.3d at 135. To determine if this prong is satisfied, courts look to the totality of the circumstances, but generally consider:

> (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.

*United States v. Pence*, 172 F.4th 213, 218 (2d Cir. 2026). [6]

B. Application

Defendant was not subject to a custodial interrogation because she was not in custody for *Miranda* purposes when the officers spoke to her. As a threshold matter, the officers did not place defendant under arrest or tell her that she was not free to leave. Mot. 4; Opp'n 1–3. "In the absence of actual arrest, an interrogation is not custodial unless the authorities affirmatively convey the message that the defendant is not free to leave, or that [s]he is completely at the mercy of the police." *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017). No such message was conveyed here. *See* Mot. 2 (arguing that defendant was "[u]nder the *implicit* coercive pressure of [the] four agents") (emphasis added).

---

6 The government urges this Court to adopt non-binding and out of circuit precedent holding that the defendant bears the burden of establishing that she was in custody for *Miranda* purposes. Opp'n 3–4. While "acknowledg[ing] that there is some dispute [in this Circuit] over which party carries the burden of proving that a defendant was in custody," *United States v. Beal*, 730 F. App'x 30, 33 (2d Cir. 2018) (summary order), the Court declines to opine on this open question because—on these facts—the Court's custody analysis remains the same regardless.

And even accepting that a reasonable person in defendant's position might have been "justifiably nervous and intimidated" by the unannounced presence of the officers, Mot. 3, her "freedom of action" was not "curtailed to a degree associated with formal arrest." *Pence*, 172 F.4th at 218.

First, defendant was interviewed in her own home. Mot. 1. "[C]ourts rarely conclude, absent a formal arrest, that a suspect questioned in her own home is 'in custody.'" *Faux*, 828 F.3d at 135–36. That is especially so where, as here, there are no "aggravating factors" that would "distinguish this case from those where home interviews were held non–custodial." *Id.* at 136.

For example, the number of officers present—four—does not indicate custody. *See Newton*, 369 F.3d at 675 (observing that the presence of six officers "would not, by itself, have led a reasonable person . . . to conclude that he was in custody"). Indeed, the Second Circuit has found defendants *not* in custody despite the presence of many more officers. *See Faux*, 828 F.3d at 136 (finding defendant not in custody while acknowledging that "it is probable that 10 to 15 agents would be more than enough to occupy every room [in the defendant's house] simultaneously"); *United States v. Schaffer*, 851 F.3d 166, 175 (2d Cir. 2017) ("[W]hile there were nine agents inside [the defendant]'s office during the search, only [two] conducted the interview, which took place in a separate part of the office. . . .").

Moreover, this is not a case in which defendant asked to terminate the interview but was refused. *See Faux*, 828 F.3d at 138–39 (defendant not in custody where "she was never told that she was *not* free to leave [and] she did not seek to end the encounter" (emphasis in original)); *see United States v. Rankin*, No. 23-cr-00024, 2024 WL 1513688, at *9 (E.D.N.Y. Apr. 8, 2024) ("[A]lthough [the defendant] points to the fact that he stated

that he would 'rather not' speak with the agents . . . . [there was] no indication that [he] affirmatively tried to end the conversation and was not permitted to do so.").

And the officers' conduct further illustrates that defendant was not in custody. As the Second Circuit has explained, where officers do not display their weapons, threaten physical force, or use any restraints, those facts "militate against a finding of custody." *Faux*, 828 F.3d at 138. So too here, where defendant alleges neither that she was restrained nor that the officers drew their weapons at any point during the interaction. *See Rankin*, 2024 WL 1513688, at *7–8 (holding that the defendant was not in custody despite the fact that officers "entered by employing a battering ram[,]" "detained his family at gunpoint while searching the house[,]" and "brandish[ed] their weapons upon entering the home[,]" in part because "no weapons were drawn during the interview").

And though the officers never explicitly told defendant that she was free to leave, that fact carries little weight here because the custody inquiry "focuses upon the presence or absence of affirmative indications that the defendant was *not* free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992) (emphasis added). Put differently, the absence of an affirmative statement that defendant was free to leave does not indicate that she was in custody. *United States v. Carter*, No. 22-cr-00316, 2024 WL 36988, at *9 (E.D.N.Y. Jan. 3, 2024) ("[A]bsen[t] [] a formal arrest, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or allow the suspect to do so.'" (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969))); *see also Faux*, 828 F.3d at 135 ("Custody for *Miranda* purposes is not coterminous with the colloquial understanding of custody."). Defendant's insistence that the officers fostered a "coercive atmosphere" by merely informing her that lying to a federal agent is

a crime, Mot. 3, does not change this conclusion. *See United States v. Austin*, 729 F. Supp. 3d 396, 408 (S.D.N.Y. 2024) ("Although the [o]fficers . . . cautioned [defendant] that lying to a federal agent is a crime, the context of their questions indicates that these . . . comments were not so accusatory and confrontational to indicate that [he] was not free to choose not to answer such questions.").

Finally, defendant's arguments about her fears and her faith also miss the mark. First, defendant's attestation that she felt "intimidated and terrified," Mot. 1; Def.'s Decl. ¶ 9, is unavailing because the custody inquiry is an objective one and "defendant's subjective belief about . . . her status generally does not bear on the [] analysis." *Faux*, 828 F.3d at 135; *Mitchell*, 966 F.2d at 99 (finding that a defendant's testimony that he was intimidated by an agent's facial features insufficient to establish custody for *Miranda* purposes). And defendant's contention that the officers' presence in her home constituted a violation of her Muslim faith lacks persuasive force because the record does not reflect that defendant expressed her fear or explained her faith-based objection to the presence of men in her home to the officers, and that objection was then ignored. Opp'n 6; *see generally* Def.'s Decl.

Based on the above considerations, the Court finds that defendant was not subject to a custodial interrogation, and thus no *Miranda* warning was required from the officers. Accordingly, suppression on this ground is unwarranted.

## II. Voluntariness

Defendant argues that her statements to law enforcement should be suppressed nonetheless because they were a result of coercion and thus involuntary. Mot. 2–3. In support, defendant again points to the number of officers in her home, the fact that she

was not told she was free to leave and was told that lying to a federal agent is a crime, and the fact that the officers' very presence in her home was a violation of her religious beliefs. Mot. 3–4.

The government counters that "defendant's personal characteristics, the location and duration of the interrogation, and the nature of the questioning" fail to indicate that her statement was anything but voluntary. Opp'n 9. The government has the winning argument.

### A. Legal Standard

An interrogation includes "any words or actions that are likely to have the force of a question on the accused and [would] therefore be reasonably likely to elicit an incriminating response." *United States v. Carr*, 63 F. Supp. 3d 226, 237 (E.D.N.Y. 2014); *see also United States v. Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015) (summary order) ("[I]nterrogation can take the form of express questioning or its functional equivalent, which includes words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980))). In assessing whether the police "should have known" that their actions were reasonably likely to elicit an incriminating response, courts consider the totality of the circumstances. *Broughton*, 600 F. App'x at 783.

That said, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and, thus, do not require preliminary advice of rights." *United States v. Rommy*, 506 F.3d 108, 132 (2d Cir. 2007) (quoting *Miranda*, 384 U.S. at 478). Where a defendant has alleged police custodial interrogation in the absence of *Miranda* warnings,

"the burden shifts to the government to prove *Miranda* voluntariness[.]" *United States v. Northover*, No. 25-cr-0087, 2026 WL 1179599, at *5 (S.D.N.Y. Apr. 30, 2026).

"[S]tatements made during noncustodial interrogations can be deemed involuntary only in special circumstances." *United States v. Vado*, 87 F. Supp. 3d 472, 482 (S.D.N.Y. 2015); *see Beckwith v. United States,* 425 U.S. 341, 347–48 (1976) ("We recognize, of course, that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where the behavior of law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined."). The "issue of voluntariness is a legal question requiring independent federal determination . . . of the totality of the surrounding circumstances, " *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997), including: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials," *United States v. Mendonca*, 88 F.4th 144, 164 (2d Cir. 2023) (quoting *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018)); *see also Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988) (explaining voluntariness factors and emphasizing that the "most critical circumstance . . . is the law enforcement officers' conduct."). A confession is not voluntary if "obtained under circumstances that overbear the defendant's will at the time it is given." *Mendonca*, 88 F.4th at 163–64.

B. <u>Application</u>

The totality of the circumstances surrounding the interrogation indicate that defendant's will was not overborne but rather that her statements were voluntary. First, defendant is an adult. She does not claim, nor is there evidence in the record that she

"lack[s] [] education or intelligence." *United States v. Gavino*, No. 22-cr-00136, 2024 WL 85072, at *8 (E.D.N.Y. Jan. 7, 2024); *see generally* Mot.[7]

Nor do the conditions of the interrogation suggest coercion. Contrary to defendant's claim that the officers created a coercive environment by entering her home, Mot. 4, "it is not unreasonable for officers to seek interviews with suspects or witnesses or to call upon them in their homes for such purposes." *United States v. Schaefer*, 859 F. Supp. 2d 397, 413 (E.D.N.Y. 2012), *aff'd*, 519 F. App'x 71 (2d Cir. 2013) (summary order). And as discussed *supra* § I.B, no other aspects of the interview suggest coercion.

Finally, the officers' conduct does not indicate that defendant's statements were made involuntarily. Coercive police conduct is "a necessary . . . condition to a finding of involuntariness." *Mendonca*, 88 F.4th at 164 (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Coercive conduct can include "repeated and prolonged . . . questioning," "failure to inform the accused of [their] constitutional rights," "physical mistreatment," "l[enghthy] restraint in handcuffs," or "physical deprivations [] such as depriving an accused of food, water or sleep, or even of clothing[.]" *Gavino*, 2024 WL 85072, at *8. Here, however, evidence of such conduct is absent. Defendant does not assert that she

7 Even if defendant presented evidence of diminished capacity, "[a] diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *United States v. Parker*, 116 F. Supp. 3d 159, 174 (W.D.N.Y. 2015) (quoting *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998)); *see also United States v. Taylor*, 745 F.3d 15, 24 (2d Cir. 2014) ("[An] individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual."). As discussed below, there is no evidence of coercion by the officers who conducted the interview.

was touched, threatened, restrained, or deprived of any basic necessities, and the record does not indicate that she was repeatedly questioned. Mot. 1; Opp'n 1–3.[8]

Because the totality of the circumstances indicates that defendant's statements were voluntarily made, suppression is inappropriate on this ground as well.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress is **DENIED**.

**SO ORDERED.**

*/s/ Natasha C. Merle*
NATASHA C. MERLE
United States District Judge

Dated: November 6, 2026
Brooklyn, New York

[8] Defendant's argument that the 1001 warning the officers provided amounts to coercion, Mot. 3, is also unavailing because it *is* a crime to lie to federal agents. 18 U.S.C. § 1001. Moreover, such a warning, without more, does not even approach the level of aggression required to render a statement involuntary. *See Haak*, 884 F.3d at 412 (reversing suppression of statements made after officer told defendant he needed to "get on board" and that if "[he] shut [his] mouth . . . the weight of the federal government [wa]s gonna come down on [him]").